**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TRICIA CHERUNDOLO, | CASE NO. 1:14-cv-01118-YK-GBC |
| Plaintiff, | (JUDGE KANE) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 9, 10, 14, 15, 16, 19 |

## REPORT AND RECOMMENDATION

### I.     Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Tricia Cherundolo for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Plaintiff alleges disability as a result of mental and physical impairments with an onset date of November 2, 2010. However, the record contains only three months of mental health treatment after the onset date, with no mental health treatment records from February 17, 2011 through January 22, 2013, the date of the ALJ decision. The record contains only seven months of medical treatment after the onset date, with no physical health treatment records from June 24, 2011 through January 22, 2013. Plaintiff asserts that she was too depressed to

continue treatment, but had been assessed with a global assessment of functioning ("GAF") of 60, which denotes only moderate symptoms, on January 26, 2011, only a few weeks before her last mental health treatment record. Moreover, Plaintiff retains the burden to establish disability with medical evidence. Plaintiff's depression may explain a lack of treatment, but it does not mean she automatically meets her burden of proving disability without providing supporting medical records.

Plaintiff did not submit a treating source medical opinion that she was disabled. The record contains conflicting state agency mental health opinions. In June of 2011, an examining psychologist opined that Plaintiff had some marked limitations that may be work-preclusive. However, in July of 2011, a reviewing psychologist evaluated the medical records, including the examining opinion, and concluded that Plaintiff could perform a range of simple, unskilled work. The reviewing psychologist noted that the examining psychologist relied on Plaintiff's report of obsessive compulsive disorder ("OCD") symptoms and behaviors, but the treatment record showed that Plaintiff had never been diagnosed with OCD and had never reported OCD symptoms to any treating providers. An ALJ is entitled to resolve a conflict between two medical opinions, and properly resolved the conflict here in favor of the reviewing physician. The record contains consistent state agency physical function opinions. Both an examining and reviewing physician

opined that Plaintiff could perform a range of light work. The ALJ partly credited both opinions, but gave Plaintiff the benefit of the doubt and reduced her to a range of sedentary work. Overall, the ALJ properly relied on Plaintiff's treatment record and the medical opinion evidence, and substantial evidence supports the denial of benefits. For the foregoing reasons, the Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

## II.     Procedural Background

On March 14, 2011, Plaintiff filed an application for SSI and DIB under the Act. (Tr. 181-93). On August 1, 2011, the Bureau of Disability Determination denied this application, (Tr. 122-47) and Plaintiff filed a request for a hearing on August 15, 2011.  (Tr. 157-58). On December 6, 2012, an ALJ held hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 39-50). On January 8, 2013, an ALJ held a hearing at which Plaintiff's mother testified and Plaintiff's counsel made arguments based on a new consultative examination. (Tr. 39-49).  On January 22, 2013, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 19-38). On March 11, 2013, Plaintiff filed a request for review with the Appeals Council (Tr. 17), which the Appeals Council denied on April 15, 2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On June 13, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On August 21, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 9, 10). On November 19, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 14, 15, 16). On November 5, 2014, the case was referred to the undersigned Magistrate Judge. On January 21, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 19). Plaintiff did not file a reply, and the matter is now ripe for review.

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y*

*of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must

demonstrate an "inability to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. §

1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that

he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his
> age, education, and work experience, engage in any other kind of substantial
> gainful work which exists in the national economy, regardless of whether
> such work exists in the immediate area in which he lives, or whether a
> specific job vacancy exists for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a

person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also*

*Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds

that a Plaintiff is disabled or not disabled at any point in the sequence, review does

not proceed. *See* 20 C.F.R. § 404.1520.   The Commissioner must sequentially

determine: (1) whether the claimant is engaged in substantial gainful activity; (2)

whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

Specifically, the Act provides that:

An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require. An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or

psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.

42 U.S.C. § 423(d)(5)(A); 42 U.S.C.A. § 1382c(a)(3)(H)(i) ("In making determinations with respect to disability under [the SSI] subchapter, the provisions of sections 421(h), 421(k), and 423(d)(5) shall apply in the same manner as they apply to determinations of disability under subchapter II of this chapter").

## V. Relevant Facts in the Record

Plaintiff was born on April 28, 1975 and was classified by the Regulations as a younger individual throughout the relevant period. (Tr. 33). 20 C.F.R. § 404.1563. Plaintiff has at least a high school education and past relevant work as a general office clerk, day care attendant, and waitress. (Tr. 32-33). Plaintiff earned between $8,288.10 and $11,543.77 each year from 2002 through 2009, and $4,966.18 in 2010. (Tr. 197). Plaintiff stopped working in June of 2010. (Tr. 197, 508). She reported on different occasions in early 2011 that she lost her job because it was "eliminated" and due to "cutbacks." (Tr. 368, 573). Plaintiff previously filed a claim for disability on November 3, 2008, and was denied by an ALJ after a hearing on November 1, 2010. (Tr. 123). She asserts disability in this

application on November 2, 2010, the day after the previous ALJ decision. (Tr. 123).

### a.    Mental Impairments

Plaintiff asserts that her impairments, such as depression, anxiety, obsessive compulsive disorder ("OCD") and attention deficit-hyperactivity disorder ("ADHD") limit her mental function, specifically her memory; concentration; understanding; and ability to complete tasks, follow instructions, and get along with others. (Tr. 220).

In early 2010, Plaintiff reported depression to her primary care physician, Dr. Armando Sallavanti, D.O., but by April of 2010 she "report[ed] no feelings of down the dumps… has a good energy level, appetite, and is sleeping well. There is been no suicidal ideation. Patient has no complaints in this regard." (Tr. 356).

On July 28, 2010, Plaintiff reported to pain management specialist Dr. Avner Griver, M.D. that she was experiencing some depression as a result of her "recent loss of her job." (Tr. 367). She explained she was "recently let go from her job due to cutbacks…She has applied for SSDI." (Tr. 368).

The administrative transcript contains records of treatment at the Scranton Counseling Center from September 30, 2010 to February 17, 2011. (Tr. 555-75). Plaintiff testified that she continued treating at the Scranton Counseling Center through December of 2011, but there were no records after February 17, 2011 that

were presented to the ALJ, the Appeals Council, or the Court. (Tr. 84). Plaintiff was treated with a stable dose of Prozac, Abilify, and Xanax throughout her treatment at the Scranton Counseling Center. (Tr. 570).

In September, October, and November of 2010, Plaintiff reported persistent anxiety and depression along with family conflicts due to a death in the family. (Tr. 565-71). Plaintiff also reported depression and sleep problems during this time period to Dr. Gross. (Tr. 367). Providers diagnosed her with depression, not otherwise specified and assessed a GAF[1] of 51. (Tr. 571). OCD is not mentioned. (Tr. 569, 571). Symptoms included worrying, crying, feeling guilt, lost, or overwhelmed and not liking herself. (Tr. 567-68). On November 3, 2010, she

---

[1] *Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014) ("The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. The score is useful in planning treatment and predicting outcomes. *Id.* The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20…A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning.. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships") (citing *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994)).

reported difficulty with focus and distraction, but on examination, her concentration was "good" and her attention was "fair." (Tr. 565). She reported no side effects from medication. (Tr. 565). Plaintiff's mood was friendly, alert, and cooperative and her affect was appropriate. (Tr. 565).

Plaintiff alleges onset of November 2, 2010. (Tr. 123). By December 1, 2010, Plaintiff's concentration remained "good" and her attention had improved to "good." (Tr. 563). Plaintiff reported continuing to feel depressed and anxious, crying, and isolating, and on examination , her mood was depressed. (Tr. 563). Her mental status examination was otherwise normal. (Tr. 563).

On January 26, 2011, Plaintiff followed-up at Scranton Counseling Center. (Tr. 559). Her GAF had improved to 60 and her only diagnosis was major depressive disorder. (Tr. 559). Plaintiff reported physical complaints, but noted that Abilify helped her feel less anxious and better able to handle situations. (Tr. 558). Her attention and concentration were "good," her mood was friendly, alert, and cooperative without depression, her affect was appropriate, and she reported no medication side effects. (Tr. 558).

On February 2, 2011, Plaintiff "no-showed" for her appointment at Scranton Counseling. (Tr. 557).

On February 3, 2011, Dr. Sallavanti again noted that "[p]atient report[ed] no feelings of down the dumps. Patient has a good energy level, appetite, and is

sleeping well. There is been no suicidal ideation. Patient has no complaints in this regard." (Tr. 350).[2]

On February 17, 2011, Plaintiff presented to psychology student extern Alison Paules, M.A., for "evaluation to rule in or rule out a diagnosis of ADHD." (Tr. 575). Objective testing showed her "results…were not within normal limits and [were] suggestive of an attentional disorder" with "difficulty in sustaining attention in a highly stimulating. high frequency response activity" and "difficulty maintaining attention after 5-6 minutes of a low response (boring) task." (Tr. 574). Plaintiff endorsed "all 18 symptoms" on an adult ADHD checklist. (Tr. 574). Ms. Paules also observed speech that was "clear although tangential at times" and that, at times, "she spoke quickly and provided overly detailed answers." (Tr. 574). Her mood "appeared to be depressed," she was tearful at times, and reported that she was anxious. (Tr. 573). However, she "appropriately dressed with care taken to hygiene," had "fair to good" insight and judgment, and maintained eye contact with Ms. Paules. (Tr. 573). Ms. Paules diagnosed Plaintiff with ADHD, assessed her to have a GAF of 50, and opined that "her medical and psychiatric symptoms currently appear to be exacerbating one another and fostering a sense of hopelessness and discouragement. The impact of her symptoms appears to be significantly impairing her daily activity, self-esteem, and overall well-being." (Tr.

_____

[2] This paragraph  is copied word-for-word from the April 16, 2010 visit. (Tr. 350, 356).

575). She recommended Plaintiff "seek a medical evaluation in order to rule out an organic cause of her symptoms of inattention." (Tr. 575). Plaintiff reported that she had stopped working when her job was eliminated. (Tr. 573).

On February 24, 2011, Dr. Gross noted Plaintiff's history of depression "following her neurological difficulties," but did not note any mental status complaints. (Tr. 424-26).

On March 14, 2011, Plaintiff applied for disability with a state agency employee. (Tr. 234). The state agency employer observed problems with talking and answering questions and indicated that she "did not remember dates" and "was depressed." (Tr. 223).

On March 22, 2011, she indicated on a function report that she could not sleep through the night, rested for at least two hours during the day, and could not focus on television. (Tr. 215). She reported that her daughters supported her and that she was going to therapy three times per week. (Tr. 215). She indicated that she would "let herself go" with regard to grooming when she was depressed and that she needed her mother to remind her take medication. (Tr. 217). She reported that she gets distracted while performing daily activities and forgets what she is doing. (Tr. 217). She indicated that she needed encouragement to perform chores, did not like to be around people, had no social life, no hobbies, and panics if she goes out without someone with her. (Tr. 217-19). She reported that she took her

children to church, but not if pain or depression precluded her. (Tr. 219). She reported that she could only pay attention for a "couple of minutes," did not finish what she started (such as a conversation, chores, reading, or watching a movie), and could not follow instructions because her "understanding [was] gone." (Tr. 220). She reported that authority figures, stress, and changes in routine caused her nervousness, panic, anxiety, jitteriness, and crying spells. (Tr. 221).

Plaintiff's mother authored a function report the same day. (Tr. 225). She reported that Plaintiff's daughters are self-sufficient and help support Plaintiff. (Tr. 225). She also indicated Plaintiff had problems with sleep, naps, medication reminders, encouragement, cooking, fear of people, going out alone, focus, concentration, attention, completing tasks, following instructions, and handling authority figures, stress, and changes in routine. (Tr. 225-30). She wrote that Plaintiff's "problems have changed her entirely" and that she was "not the daughter that [she] knew." (Tr. 230).

On June 6, 2011, Plaintiff presented to state agency psychologist Dr. Tim Lionette, Ph.D. for a consultative examination. (Tr. 453). He noted that:

> According to Ms. Cherundolo she has been diagnosed with obsessive-compulsive disorder . She indicates that she needs to line "things up." She needs to have her dishes lined up in a certain order. In addition, she indicates that she engages in a significant number of checking behaviors. She was reportedly diagnosed at the Scranton Counseling Center and is currently receiving outpatient therapy.
> …

> Ms. Cherundolo reports needing to engage in checking behavior. She indicates that she will often check to see if the door is locked four or five times.

(Tr. 453-54). She also reported feeling forgetful, depressed, and like people are talking about her. (Tr. 454). Plaintiff reported that she "has a social life with a number of friends as they will come over and visit her and speak to her on the phone…she enjoys playing board games and cards." (Tr. 455). She reported that she "stopped going to work because she could no longer perform the functions of her job." (Tr. 455).

On mental status examination, he observed that she was "quite unkempt," "anxious and as a result somewhat labile in her mood" with "periods of crying," "shaking throughout the entire evaluation and…seemingly has tremors," intermittent eye contact, "somewhat limited" insight and judgment, limited immediate and working memory, and difficulty understanding how to perform serial sevens.(Tr. 456). He opined that Plaintiff's mental impairments caused limitations that could be characterized as work-preclusive, specifically a GAF of 49, marked limitations in making judgments on simple work-related decisions and responding appropriately to work pressures in a usual work setting or changes in a routine work setting. (Tr. 451). He opined that Plaintiff was limited in her ability to perform detailed instructions, but not simple instructions, and was not limited in

her ability to interact with others. (Tr. 451). He cited Plaintiff's obsessive thoughts and behavior, excessive anxiety, and mood instability. (Tr. 451).

On June 27, 2011, the reviewing psychologist, Dr. Frank Mrykalo, Ed.D, disagreed with Dr. Lionette and opined that Plaintiff was capable of "making simple work related decisions; follow simple 1-2 step task directives; cope with minor work related demands; performs simple routine type tasks; understand and retain simple task instructions." (Tr. 131). Dr. Mrykalo noted that at "various medical visits," there was "no mention made of OCD." (Tr. 128). He cited Plaintiff's lack of inpatient hospitalization and "essentially unremarkable" mental status examinations. (Tr. 128). He also noted that, at Plaintiff's February 2011 follow-up with Dr. Sallavanti, Plaintiff had "no complaints," and "no report of depression." (Tr. 128).

On September 18, 2012, Plaintiff testified at a hearing before the ALJ. (Tr. 77). She testified that, although she had insurance, she had not received significant treatment from any source in many months. (Tr. 78, 81, 83, 88). She last saw Dr. Grady in December of 2010 and Dr. Sallavanti in March of 2011. *Id.* She explained that she was so depressed and withdrawn that she could not leave her house or continue treatment. *Id.* She testified that she had last treated at Scranton Counseling in December of 2011, and that she stopped because she was unable to see her counselor, she did not want to see a different counselor, and she was so

depressed that she did not want to do anything. (Tr. 84). She testified that she was no longer taking any medication for mental impairments because she was unable to return to Scranton Counseling due to her discomfort around people. (Tr. 84). She testified that she no longer wanted to socialize. (Tr. 86).

At a hearing on January 8, 2013, Plaintiff's mother testified that she lives five miles from Plaintiff and sees her every day or every other day. (Tr. 44). She testified that Plaintiff was "very depressed" an "cries a lot." (Tr. 46). She explained that Plaintiff "doesn't have any friends" because her friends "distanced themselves" when her mobility was limited. (Tr. 46). She testified that Plaintiff was anxious and lonely and would not be able to live by herself if her mother and daughters could not help her. (Tr. 46-47).

### b. Physical Limitations

Plaintiff asserts that her impairments limit her physical function, specifically her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, and use her hands. (Tr. 220).

Plaintiff had a carpal tunnel release in both hands in April and May of 2008. (Tr. 528-31). In 2009, a cervical MRI indicated mild degenerative changes, a "prominent disk/osteophyte impression on the left…with left intervertebral stenosis," and a "mild disk osteophyte impression on the left…with mild foraminal stenosis. (Tr. 535).

At her February 19, 2010 visit with Dr. Sallavanti, she reported pain, weakness, stiffness, paresthesias, and fatigue. (Tr. 361). Plaintiff's existing problems included fibromyalgia, which Dr. Sallavanti assessed as "deteriorated" and cervical disc disease, paresthesia, joint pain, and intractable migraine, which Dr. Sallavanti assessed as "unchanged." (Tr. 362). Plaintiff's medications included Vicodin and Flexeril. (Tr. 362). On April 16, 2010, Plaintiff's report to Dr. Sallavanti was unchanged, except that she denied weakness. (Tr. 356-57). She had left cervical spasm with decreased range of motion in her back. (Tr. 357). Her prescriptions included Ultram and trileptal. (Tr. 357).

On June 9, 2010, Plaintiff presented to orthopedist Dr. Eugene Grady, M.D. (Tr. 270). Plaintiff had fibromyalgia trigger points and widespread tenderness to palpation. (Tr. 270). Plaintiff did not "even have the desire to go out and do an exercise program" and was "not able to do aquatic therapy." (Tr. 270). He assessed her to have fibromyalgia, depression, hypothyroidism, and electrophysiologic evidence of cervical radiculopathy. (Tr. 270). He prescribed Savella for her fibromyalgia. (Tr. 270).

Plaintiff established care with pain management specialist Dr. Avner Griver, M.D. in March of 2010. (Tr. 366). She was diagnosed with fibromyalgia. (Tr. 366). He recommended that she stop taking Vicodin because Vicodin is not effective against fibromyalgia and might aggravate fibromyalgia. (Tr. 366). She reported

worsening pain, weakness, and paralysis through 2010. (Tr. 366-67). She reported swelling and a fall that aggravated her condition. (Tr. 367). On July 28, 2010, she reported more depression after losing her job, but better sleep and minor pain improvement. (Tr. 367). She reported that she was following with Scranton Counseling Center "monthly." (Tr. 366).

On November 1, 2010, Plaintiff was denied benefits under her previous application. (Tr. 123). She alleges onset under this application as of November 2, 2010. (Tr. 123).

On December 10, 2010, Plaintiff presented to Dr. Grady and reported increased pain and decreased function. (Tr. 271). MS Contin, a "more long term opiod analgesic," was added, with Vicodin for breakthrough pain, and her Savella was continued. (Tr. 271).

On December 29, 2010, Plaintiff was hospitalized at Moses Taylor Hospital. (Tr. 283, 298-99, 521-24). She complained of "[w]eakness, numbness, lower back pain, gait instability." (Tr. 298). Additional diagnoses on admission and discharge were fibromyalgia, anxiety disorder, chronic pain syndrome, insomnia, hypothyroidism, bipolar disorder, and resistant depression. (Tr. 298). Plaintiff reported that she was unable to "ambulate or get up from a seated or lying position and having extreme pain." (Tr. 298). Lumbar and thoracic spine imaging "showed no significant abnormality" and her X-rays were "within normal limits." (Tr. 285,

298). Specifically, her lumbar spine MRI showed "mild degenerative change in the facet joints," a "mild disc protrusion at L4-5 with no foraminal stenosis," and a "broad-based disk bulge at L3-4 with no foraminal stenosis." (Tr. 296). This MRI was unchanged from an MRI on July 28, 2009. (Tr. 296, 537).

Plaintiff had "normal labs," had "no other localizing signs neurologically," and Plaintiff "physically, except for weakness, was within normal limits." (Tr. 299). The hospital neurologist opined that Plaintiff had a "mixed process" occurring neurologically, with "some chronic pain syndrome." (Tr. 299). Plaintiff was discharged on January 4, 2011 with instructions to follow-up with a pain management specialist, rheumatologist, and neurologist. (Tr. 299).

On January 13, 2011, Plaintiff presented to neurologist Dr. Mitchell Gross for an evaluation of her weakness and paresthesias. (Tr. 407-14). She reported a five year history of intermittent numbness and tingling. (Tr. 407). She indicated that "in December of 2010, she developed numbness and tingling from her waist down which has been constant ever since" with an intermittent burning sensation. (Tr. 407). She reported feeling fatigued and very depressed. (Tr. 407). She was well-groomed and cooperative, although she was slightly anxious. (Tr. 409). Her attention and concentration were appropriate and her mental status examination was normal. (Tr. 409). Her muscle tone was normal and she had no atrophy. (Tr. 409). Dr. Gross noted "trace weakness of both the upper and lower extremities" but

also observed "poor participation." (Tr. 409). Her musculoskeletal, cranial nerve, and cerebellar examinations were normal, with symmetric range of motion in her upper extremities and normal reflexes. (Tr. 409-410). Her gait was "slow," she used a walker to ambulate, and her sensation was impaired. (Tr. 410). He noted that MRIs of the cervical and thoracic spine were unremarkable. (Tr. 411). He noted that Plaintiff needed an MRI of the brain to rule out multiple sclerosis and other demyelinating disease. (Tr. 411). Plaintiff's only diagnoses were "skin sensation" and "muscle weakness." (Tr. 414).

On January 26, 2011, Plaintiff reported increased pain to Dr. Griver. (Tr. 367). He observed eighteen of eighteen trigger points, give-way weakness, and pain to palpation on her thighs. (Tr. 369). Plaintiff also reported tingling from the waist down. (Tr. 369). He assessed her to have fibromyalgia and instructed her to continue Savella, discontinue Baclofen, and follow-up with Dr. Gross and Scranton Counseling Center. (Tr. 369). He noted, "[n]othing to add, [follow-up] on a 3 [times] a year basis and [as needed]." (Tr. 369).

On February 3, 2011, Plaintiff followed-up with Dr. Sallavanti. (Tr. 351). She reported musculoskeletal and neurological symptoms, examination revealed left cervical spasm with decreased range of motion, and she ambulated with a cane. (Tr. 351). She was instructed to follow-up with a neurologist and a rheumatologist, and there was a question of a diagnosis of multiple sclerosis. (Tr. 351).

On February 24, 2011, Dr. Gross noted that the MRI of Plaintiff's brain and labwork were normal. (Tr. 492). Plaintiff reported numbness, tingling, burning and crawling sensations throughout her body. (Tr. 492). She reported dropping things and that her carpal tunnel release did not relieve her symptoms. (Tr. 492). On examination, Plaintiff had a positive L'Hermittes sign, positive Tinel sign, and diffuse hyperactive reflexes. (Tr. 492). She was hypersensitive below the knees and she had generalized weakness in her lower extremities. (Tr. 492). She used a straight cane and her gait was cautious but stable. (Tr. 492). Dr. Gross opined that Plaintiff has "[s]ymptoms of sensory and reflex changes suggestive of an upper motor neuron syndrome but no clear structural or intrinsic cord or brain disease noted on studies." (Tr. 492). She was instructed to follow-up in four months. (Tr. 493).

Plaintiff attended physical therapy from February 16, 2011 through March 8, 2011. (Tr. 435-47). The initial evaluation indicated that Plaintiff had decreased strength, walked with a cane, and could ambulate on even surfaces for fifty feet. (Tr. 439). She had gait deviations and the Berg Balance Scale indicated a high risk for falling. (Tr. 440). She was scheduled for twenty-four sessions of physical therapy. (Tr. 441). Plaintiff attended only four sessions after her initial evaluation, and the record does not include a discharge summary. (Tr. 443).

In a function report dated March 22, 2011, she reported needing help dressing, bathing, caring for her hair, shaving, and using the toilet as a result of physical limitations. (Tr. 216). She reported problems with jar lids and opening cans. (Tr. 217). She indicated that the only household chores she could perform were dusting furniture and wiping down windows, which take her longer than usual due to pain. (Tr. 217). She indicated that she could drive and ride in a car, but only drove "when necessary." (Tr. 218). She reported she was no longer able to bake, garden, cook, go on long walks, or do crafts. (Tr. 219). She indicated that she could only lift three pounds, used a cane or walker to ambulate, and often had to stop to rest. (Tr. 220). She reported that she could walk no more than one hundred feet at a time. (Tr. 220). She indicated that she also uses a raised toilet seat and a shower chair on a daily basis. (Tr. 221).

The same day, Plaintiff's mother authored a function report. She also reported that Plaintiff had problems dressing, bathing, shaving, cooking, household chores, falling down, walking more than a half a block, lifting, performing postural movements, and using her hands and that she uses a toilet seat, cane, walker, and shower chair. (Tr. 224-30).

On June 24, 2011, Plaintiff followed-up with Dr. Gross. (Tr. 501). Plaintiff reported "falling a lot but not as much as previously." (Tr. 501). He observed that her speech was "slightly slurred." (Tr. 501). Her gait was "cautious, mildly spastic,

stable with straight cane" and she had "[s]lightly flexed trunk when standing." (Tr. 501). Her L'Hermittes sign was negative "but [she had] increased scalp paresthesias with neck flexion." (Tr. 501). Her reflexes were hyperactive with clonus. (Tr. 501). She was assessed to have "non-specific myalgias and paresthesias" with reflexes "suggestive of an upper motor neuron syndrome." (Tr. 501). Dr. Gross indicated that he would increase her "Lamictal as she feels some benefit with this medication." (Tr. 501).

The transcript contains no treatment records from June 24, 2011 through the date of the ALJ decision on January 22, 2013. An examining state agency physician and a reviewing state agency physician authored medical opinions indicating Plaintiff could perform a range of light work despite her symptoms and impairments. There is no treating physician opinion.

On July 20, 2011, the reviewing physician, Dr. Jan Kapcala, D.O., noted that there was "no supportive evidence" of fibromyalgia, as the neurologist stated "non-specific myalgias and paresthesias" and no definite diagnosis had been established. (Tr. 139-40). Dr. Kapcala opined that Plaintiff could perform light work with no sitting, pushing, pulling, manipulative, visual, or communicative limitations and occasional or frequent postural movements. (Tr. 129-30).

On September 18, 2012, Plaintiff testified that she had pain "all the time" along with numbness, tingling, a burning sensation, blurred vision, and lumps on

her arms from fibromyalgia. (Tr. 77-79). She indicated that her pain in her neck prevented her from sitting, she had constant shoulder pain, and her carpal tunnel release did not help. (Tr. 80). She explained that she dropped things and could not always use the toilet herself because her hands would ball up. (Tr. 81). She testified to numbness in her lower extremities that caused her to fall all the time, and showed the ALJ brush burns on her legs. (Tr. 82). She reported that she had stopped driving and walked with a walker prescribed by Dr. Sallavanti. (Tr. 83). She testified that she was unable to perform most household chores, and that her mother, friend, and children help with laundry, cleaning, and cooking. (Tr. 84-85). Plaintiff testified that her mother came to her home to help almost every day. (Tr. 87). She indicated that she could not sit for more than twenty minutes at a time and could not stand for more than ten minutes at a time. (Tr. 85). She reported incontinence. (Tr. 87). Plaintiff testified that her condition had worsened over the past year. (Tr. 86-87).

On October 17, 2012, the examining physician, Dr. Vithalbhai Dhaduk, M.D., observed generalized weakness, mild dysmetria, mildly ataxic gait with use of a walker, and "significant irregular tremors" with stress, but normal extremities, muscle strength, sensation, and reflexes. (Tr. 636-37). He acknowledged that she complained of "major anxiety with depression… increasing burning pain with tingling and numbness and pins and needles in the neck and the back as well as

different parts of the body…freezing episodes…having trouble walking and losing [her] balance…walks with a walker…having incontinence of urine…a hard time to sleep at nighttime…difficulty in even dressing…has two daughters and [they help her] to get dressed…is under tremendous stress…[and has] muscle spasm." (Tr. 634-634). He diagnosed her with "[m]ultiple neurological symptomatology without any significant focal neurological signs, most likely due to major anxiety with depression," "[h]istory of fibromyalgia," and "[h]istory of heart disease" and opined that her prognosis was poor. (Tr. 638). However, Dr. Dhaduk opined Plaintiff could perform light work with no sitting, pushing, or pulling limitations, restricted to occasional postural activities with some limitation in handling and fingering. (Tr. 629).

At a hearing on January 8, 2013, her mother testified that she needed help dressing and with personal care, her daughters do most of the household work, could not sit for more than fifteen minutes, and uses her walker all the time. (Tr. 46). Plaintiff's mother testified that she was "unable really to do anything" and was "lucky she feeds herself." (Tr. 47).

### c.     ALJ Findings

The ALJ issued the decision on January 22, 2013. (Tr. 34). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 2, 2012, the alleged onset date, and was insured through December 31,

2015. (Tr. 25). At step two, the ALJ found that Plaintiff's fibromyalgia, carpal tunnel syndrome status-post release surgery, obesity, depression, anxiety, obsessive compulsive disorder, and attention deficit/hyperactivity disorder were medically determinable and severe. (Tr. 25). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 25). The ALJ found that Plaintiff had the RFC to perform:

> [S]edentary work as defined in 20 CFR 404.1567(a) and 416.967(a). She can lift/carry no more than 10 pounds. She needs a cane/walker for ambulation. She can occasionally bend, balance, stoop, kneel, climb, crouch and crawl, but never climb on ladders/ropes/scaffolds. Finally, she is limited to simple, routine repetitive tasks.

(Tr. 27). At step four, the ALJ found that Plaintiff could not perform her past relevant work. (Tr. 32). At step five, the ALJ relied on the vocational expert testimony and found that Plaintiff could perform other work in the national economy. (Tr. 33). Accordingly, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 34).

## VI.    Plaintiff Allegations of Error

### a.  Vocational and Medical Expert Testimony

Plaintiff argues that Dr. Dhaduk should have been available at the January 2013 hearing for cross-examination. (Pl. Brief at 4-6). At the hearing, Dr. Dhaduk was not present. (Tr. 39-47). However, Plaintiff's counsel made no mention of his absence. (Tr. 39-47). The ALJ has offered Plaintiff an opportunity to send written

questions to Dr. Dhaduk, but Plaintiff never sent written questions to Dr. Dhaduk. (Tr. 260-61). Plaintiff did not assert that Dr. Dhaduk's absence was an error until after the ALJ decision, when requesting Appeals Council review.

Regardless, to the extent Plaintiff is arguing that Dr. Dhaduk's absence constitutes a failure to develop the record, Plaintiff has not alleged any prejudice from his absence. The Plaintiff must show clear evidence of prejudice from this error. "The question is not 'whether every question was asked which might have been asked…[but] whether the record reveals evidentiary gaps which result in unfairness or clear prejudice.'" *Jozefick v. Shalala,* 854 F.Supp. 342, 344 (M.D.Pa.1994) (Vanaskie, J.) (quoting *Edwards v. Sullivan,* 937 F.2d 580, 585-86 (11th Cir.1991)); see also *Livingston v. Califano*, 614 F.2d 342, 345 (3d Cir. 1980) (internal citations omitted). As one Court in this District has explained:

> "While an ALJ is required to assist the claimant in developing a full record, he or she has no such obligation to 'make a case' for every claimant." *Kenyon v. Colvin,* 2013 U.S. Dist. LEXIS 175897, *13–14, 2013 WL 6628057 (M.D.Pa.2013). The burden still "lies with the claimant to develop the record regarding his or her disability because the claimant is in a better position to provide information about his or her own medical condition." *Money v. Barnhart,* 91 Fed. Appx. 210, 215 (3d Cir.2004). citing *Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), and 20 C.F.R. §§ 404.1512(a) and 416.912(a).

*Martin v. Colvin*, 4:11-CV-02378, 2014 WL 1235664 (M.D. Pa. Mar. 25, 2014)(Nealon, J.).

Plaintiff has not identified any evidentiary gap arising from Dr. Dhaduk's absence. Plaintiff has not identified the questions that would have been asked on examination or the relevance of any proposed questions. Moreover, unlike the mental opinion evidence, the two physical RFC assessments are consistent with each other. Dr. Dhaduk and Dr. Mrykalo both opined Plaintiff could perform a range of light work. Plaintiff has not identified any reason why Dr. Dhaduk's opinion should not be credited, aside from his absence at the hearing. Plaintiff has not identified any reason whatsoever to reject Dr. Mrykalo's opinion, which is similar to but less restrictive than Dr. Dhaduk's opinion. Thus, Plaintiff has not identified any prejudice arising out of Dr. Dhaduk's absence or any reason to conclude the ALJ's assignment of weight to Dr. Dhaduk and Dr. Mrykalo's opinion lacks substantial evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir. 2005) (Remand is not appropriate where ALJ's error does not affect the ultimate outcome); 28 U.S.C.A. § 2111 ("[T]he court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."). Thus, the Court finds no merit to this allegation of error and does not recommend remand on this ground.

Plaintiff also argues that the ALJ erred in eliciting the testimony of a VE at the first hearing, but not the second. (Pl. Brief at 8-9).[3] Again, however, Plaintiff did not raise this issue at the hearing. (Tr. 39-47). Plaintiff's counsel had an opportunity to question the VE, and declined. (Tr. 39-47). Moreover, Plaintiff has not identified any evidentiary gaps or prejudice arising from the failure to elicit testimony from the VE. *Livingston v. Califano*, 614 F.2d at 345. Plaintiff asserts only that it "would have been interesting to know if his testimony would have been consistent or inconsistent with the testimony of the vocational expert, Michele Giorgio, given at the hearing held on September 18, 2012." (Pl. Brief at 8). This is insufficient to establish prejudice. As discussed above, the only new evidence was Dr. Dhaduk's opinion, and Dr. Dhaduk's opinion supported the RFC assessed by the ALJ. This is the same RFC contained in a hypothetical question to the first VE. (Tr. 89-93). Thus, the Court finds no merit to this allegation of error and does not recommend remand on this ground.

### b. Credibility

Plaintiff asserts that the ALJ erred in assessing her credibility. (Pl. Brief at 6-8). In support of this claim, Plaintiff cites only her testimony and the testimony of

---

[3] Plaintiff asserts that the ALJ did not identify which VE's testimony he utilized. (Pl. Brief at 9). However, the ALJ specifically states in the opening paragraph of the decision that "Vocational expert Michele Giorgio appeared and testified at the hearing on September 18, 2012. Vocational expert Gerald W. Keating appeared but did not offer testimony at the supplemental hearing." (Tr. 22).

her mother. (Pl. Brief at 6-8). Plaintiff also writes that "[n]ot one examining physician ever questioned the claimant's credibility or even suggested she was nothing [other] than truthful." (Pl. Brief at 7). However, Plaintiff's and her mother's testimony, alone, do not establish that their testimony is credible, and there is no prerequisite that an examining physician question a claimant's truthfulness before an ALJ can make an adverse credibility determination.

When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P; *see also* 20 C.F.R. § 416.929. "Under this evaluation, a variety of factors are considered, such as: (1) 'objective medical evidence,' (2) 'daily activities,' (3) 'location, duration, frequency and intensity,' (4) medication prescribed, including its effectiveness and side effects, (5) treatment, and (6) other measures to relieve pain." *Daniello v. Colvin*, CIV. 12-1023-GMS-MPT, 2013 WL 2405442 (D. Del. June 3, 2013) (citing 20 C.F.R. § 404.1529(c)).

Plaintiff does not address any of the ALJ's rationales for rejecting her credibility. The ALJ explained that, with regard to her carpal tunnel, the only mention of carpal tunnel syndrome during the relevant period is to Dr. Gross on February 24, 2011. (Tr. 29, 492). Other than that, "[t]here [was] no other treatment for carpal tunnel syndrome noted in the record." (Tr. 29). With regard to Plaintiff's symptoms generally, the ALJ writes that:

> The evidence of record indicates that she stopped working in 2010 because her position at WVIA was eliminated, not due to her physical or mental impairments (Exhibit Bl5F). Her physical problems with widespread pain began years ago when she was in high school, and there is no evidence of record to demonstrate any severe progression at or after the time she stopped working. There is simply no objective evidence of record to corroborate her ongoing complaints of severe and debilitating pain. All of her treatment appears to have ended in early 2011 with no regular follow up treatment for her mental health or her pain complaints. One would expect that someone with such severe and debilitating pain and depression would continue to seek out treatment. However, the evidence in this case reveals the opposite. The record here demonstrates that she ceased her psychological therapy and stopped regularly seeing her treating doctors in early 2011, just three months after the alleged onset. She last saw Dr. Griver for pain management in January 2011, she last saw Dr. Grady in December 2010, and last went to Scranton Counseling in February 2011. Her medications have also been decreased. In December 2010 she was taking Prozac, Ability, Savella, Vicodin, Ambien, Bac1ofen, and Pamelor (Exhibits BlF, B3F). As of 2012, her only medications were Zanaflex, Zonisamide, and Vicodin (Exhibit B22F). She no longer takes any medication for depression and anxiety. The overwhelming evidence of record diminishes the claimant's credibility regarding her symptomatology and supports the claimant's ability to perform a range of sedentary work despite the limitations arising as a result of her impairments.

(Tr. 31). The ALJ also credited the opinions of Dr. Dhaduk and Dr. Mrykalo that Plaintiff could perform the physical and mental demands of a range of simple, unskilled light work. (Tr. 31).

These are accurate characterizations of the record and appropriate reasons to discount Plaintiff's credibility. SSR 96-7p. With regard to the objective medical evidence relevant to her physical health, the ALJ gave some credit to both consistent medical opinions that Plaintiff could perform light work, although the ALJ found that Dr. Zapcala's opinion regarding postural movements was an overestimate of Plaintiff's ability. Plaintiff cites to a variety of subjective complaints and objective findings relevant to her physical function, but the Court declines to independently interpret and reweigh the evidence in the face of two opinions by medical professionals. *See Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) ("Neither the district court nor this court is empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.") (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir.1984)); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3dCir. 2011) ("Courts are not permitted to re-weigh  the evidence or impose their own factual determinations" (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) ("By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician; an

ALJ is not free to set his own expertise against that of a physician who presents competent evidence."). The question is not whether Plaintiff experienced some symptoms and demonstrated some findings that could support a finding of disability. The question is whether the ALJ reasonably concluded that, despite her physical limitations, she could perform a range of work. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Here, it was reasonable for the ALJ to rely on the medical evidence, particularly the medical opinion evidence, to conclude that the objective medical evidence regarding her physical impairments did not support her claim of disabling complaints, particularly since no treating provider opined she was disabled. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (state agency physicians are "highly qualified" and "experts" in social security disability evaluation.); *Chandler*, 667 F.3d at 361; *Brown v. Astrue*, 649 F.3d 193, 197 (3d Cir. 2011); *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991).

With regard to the objective medical evidence relevant to her mental health, her mental status examinations were essentially normal until her consultative examination with Dr. Lionette. None of her treating providers observed an unkempt appearance, problems with eye contact, limited memory, or limited understanding. (Tr. 456). Moreover, she reported OCD and significant OCD behaviors, despite never mentioning OCD to any other provider. *Supra.* She told Dr. Lionette that she lost her job due to her impairments, but she had previously

told two different treating providers that she lost her job when it was eliminated due to cutbacks. (Tr. 368, 454, 573).

Plaintiff provided no evidence of treatment from June 24, 2011 through January 22, 2013, the date of the ALJ decision. However, the Act provides that:

> An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require. An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.

42 U.S.C. § 423(d)(5)(A); 42 U.S.C.A. § 1382c(a)(3)(H)(i) ("In making determinations with respect to disability under [the SSI] subchapter, the provisions of sections 421(h), 421(k), and 423(d)(5) shall apply in the same manner as they apply to determinations of disability under subchapter II of this chapter"). Congress has not enumerated an exception for claimants who have no treatment record because they are too depressed to obtain treatment. Granting disability in cases with no treatment record could side-step the requirements of 42 U.S.C. § 423(d)(5)(A). *See Mason v. Shalala*, 994 F.2d 1058, 1068 (3d Cir. 1993) ("We do

not quarrel with the ALJ's entitlement to draw an inference adverse to appellant from the fact that appellant has not sought medical assistance to relieve his professed [disabling symptoms]"). Thus, the ALJ was entitled to rely on a lack of objective medical evidence to conclude that Plaintiff was not fully credible. SSR 96-7p. Thus, the Court finds no merit to this allegation of error and does not recommend remand on this ground.

Plaintiff also argues that the ALJ erred in assessing her RFC because she would be absent more than three times per month and off-task more than twenty percent of the time, which would preclude all work according to the VE. (Pl. Brief at 10-11). Plaintiff does not cite to the record in making this argument, and simply asserts that she "ambulates with a walker at all times, cries, suffer from times of incontinence, has memory problems, constant pain as a result of her fibromyalgia." (Pl. Brief at 10). As discussed above, the ALJ appropriately concluded that she was not fully credible and relied on the medical opinion evidence. Thus, the Court finds no merit to this allegation of error and does not recommend remand on this ground.

### c. Step Five

Plaintiff argues that:

[T]he ALJ should have consulted SSR96-9P which clearly instructs: SSR96-9P instructs that "if unable to sit for a total of 6 hours, the unskilled sedentary occupational base will be eroded." "Where an individual needs to alternate between sitting and standing and this need cannot be accommodated by scheduled breaks, the unskilled sedentary occupational

> base will be eroded." The ALJ is silent as to the degree of these limitations
> and did not mention this within the Decision.

(Pl. Brief at 11). However, SSR 96-9p simply provides general guidance as to the jobs available in the national economy. The ALJ elicited specific testimony from the vocational expert about the number of jobs available in the national economy, after accounting for erosion due to a sit/stand option. (Tr. 88-95). As SSR 00-4p explains, "[e]vidence from VEs or VSs can include information not listed in the DOT… Information about a particular job's requirements or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a VE's or VS's experience in job placement or career counseling…The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE, VS, or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT." *Id.* The ALJ was entitled to rely on this testimony to conclude that jobs with a sit/stand option were available. Thus, the Court finds no merit to this allegation of error and does not recommend remand on this ground.

## VII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the

findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I. This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II. The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections

which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: August 31, 2015                    _____s/Gerald B. Cohn_____
                                                            GERALD B. COHN
                                                  UNITED STATES MAGISTRATE JUDGE